IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
IN DALLAS

| | |
|---|---|
| BRADLEY, PORRAS, STAMP, WOLFF, LLC | § |
|     Plaintiff | § |
| | § |
| Vs. | § |
| | § |
| Unlimited Construction Co. d/b/a | § |
| The Colosseum Blacksburg, LLC, and | § |
| The Legends Blacksburg, LLC., | § |
|     Defendants | § |

**PLAINTIFF'S FIRST AMENDED ORIGINAL COMPLAINT
AND REQUEST FOR DECLARATORY JUDGMENT**

1. Bradley Porras Stamp Wolff, LLC., Attorneys & Counselors at Law, are citizens of the State of Texas whose legal mailing address is P.O. Box 191855, of Dallas County, in Dallas, Texas 75219.

2. Defendants, Unlimited Construction, Inc., et all, IS incorporated under the laws of the State of Virginia. Defendant has its principal office in the State of Virginia. Defendant does not have a registered agent for service in the State of Texas. **Service of Process on defendants** according to the laws of the State of Texas under **Fed. R. Civ. P 4th (1)(A)** is by serving the **Secretary of State of Texas** whose mailing address is **P.O. Box 12887 Austin, Texas 78711-2887.** All defendants are citizens of the State of Virginia.

3. The court has jurisdiction over the lawsuit under **28 U.S.C. Section 1332(a)(2)** because the suit is between a citizen of Texas and citizens of a foreign state, i.e. Virginia, and the amount in controversy exceeds $75,000, excluding interests and costs.

4. Venue is proper in this district because all property at issue is situated in this district. The sum of $310,000 is currently held *In Trust* in Plaintiff's IOLTA Trust Account at Bank Of America locally in Dallas, Dallas County, Texas.

5. All conditions precedent have been performed or have already transpired. **Fed. R. Civ. P. 9 (c)**.

**Breach of Contract**

6. On November 24, 2009 plaintiff and defendants executed a written contract called the Client Agreement which is also known as a Fee Agreement (hereafter called the **"Client Agreement"**, the **"Fee Agreement"**, or the **"Contract"**). A copy of this Contract is attached as **Exhibit "A".** The Contract provided that plaintiff would provide certain primary legal services; which was to negotiate and arrange (1) Offshore Banking and (2) Fund Management services (the **"initial objectives"**) on behalf of defendant. Those services would be provided for a stated fee. These services required plaintiff to travel to Europe with Defendant. To cover overhead expenses while traveling on defendant's business, a stated retainer would be paid plus travel expenses such as air and hotel, plus a Per Diem rate for incidentals; which is a standard industry custom & practice where business travel is required. The Contract further states that in the event additional services are performed, <u>or</u> if there is a fee dispute, a stated contract hourly rate of $750 would be recognized & utilized to calculate legal fees due plaintiff for services rendered & performed. Defendant requested & instructed Plaintiff to perform additional legal work outside the original initial objectives stated in the Contract. Plaintiff fully performed all services as instructed by defendant. Plaintiff therefore expected compensation for said services rendered & performed according to the terms of the contract. Due to limited capital restraints, defendants have not paid any legal fees owed plaintiff for past five (5) months, which is the disputed amount of $310,000 currently held in trust.

## <u>Count 1—Declaratory Judgment</u>

7. Plaintiff brings this suit for a Declaratory Judgment under both **Federal Rule of Civil Procedure 57** and **28 U.S.C. Sections 2201 and 2202**.

The primary issue for this Declaratory Judgment suit, therefore, is whether an attorney can satisfy outstanding obligations for services rendered and performed on behalf of it's client from assets held in trust when the controlling Contract executed between the parties clearly states attorney has been granted the authority, power and contractual right from the Client to self-indemnification from assets held in trust prior to any final disbursement to Client.

**STATEMENT OF FACTS:**

Defendant, Unlimited Construction, Inc., Mark Kinser as it's President & CEO, dba Colosseum Blacksburg, dba Legends Blacksburg, (aka the real estate developments) contacted plaintiff in July/August of 2008. Mr. Kinser was a real estate developer seeking equity partners, collateral partners, Investors, or lenders to fund his development projects. After meeting with plaintiff in Dallas, a Fee Agreement was negotiated and executed in November 2008. As stated above, the initial intent and primary purpose of

the legal relationship was for Plaintiff to provide Offshore Banking and Fund Management services; which could monetize Defendant's collateral which Defendant believed they had secured.

Unfortunately, Defendant's collateral provider failed to perform. Thus, the original intent of the legal relation evolved into Defendant requesting additional legal work to replace Defendant's collateral partner. This entailed legal work involving plaintiff's business & trade contacts to locate, negotiate and secure either (1) equity partners, or (2) collateral partners, or (3) Investors, or (4) Development Lenders, or (5) a combination thereof. Again, the Fee Agreement provided that should additional work be performed outside the 2 original objectives, a legal rate would be charged for that work. The Fee Agreement also states that in the event of dispute of legal fees, the rate would be at the same identified rate.

Under the original objectives in the Fee Agreement, Defendant paid an initial retainer to cover plaintiff's overhead costs while traveling abroad on client's business. In the event the original objectives weren't completed within the first 30 days, a subsequent reduced monthly retainer would be paid on a month to month basis until Defendant's objectives had been obtained and secured. However, due to working capital restrictions, Defendant requested the monthly retainer be reduced even lower. This new lower monthly retainer was paid monthly for the next 8 or 9 months. Then due to worsening financial condition of Defendant, in late October of 2009, Defendant gave notice they were terminating payment of the monthly retainer and an **Addendum** to the Fee Agreement was drafted. A copy of this Addendum is attached as **Exhibit "B"**. But for the record, Plaintiff never received back a countersigned copy from Defendant of this Addendum. This Addendum addressed the termination of the monthly retainer as communicated by Defendant. No other material terms were changed.

Following the Addendum, Defendant continued to instruct and ask Plaintiff to continue the pursuit of financial partners. However, prior to the Addendum, several financial partners had already been located and negotiated on behalf of Defendant and were actively in the underwriting process when the Addendum came into existence. But over the next 5 months post Addendum, Plaintiff continued to take defendant's instruction and perform all the legal work as requested by defendant. Repeated conversations with defendant regarding the fact plaintiff never agreed to work for free were disregarded (please see attached **Exhibit "C-1":** Trip Cancellation Notice, **Exhibit "C-2":** Payment Demand 1, and **Exhibit "C-3":** Payment Demand 2.). In the interim, several more potential financial partners were located, terms negotiated and legal agreements drafted by plaintiff on behalf of defendant. These are described below.

In February 2009, one such potential financial partner, Luis Miguel Yanguela, hereinafter **"Collateral Provider 1",** agreed to secure and deliver

collateral on behalf of defendant as a Collateral Partner. Said collateral provider required an escrow be established for the payment of their fees which would be payable upon delivery of the collateral. Plaintiff drafted a Collateral Agreement. A copy of this Contract is attached as **Exhibit "D"**. And plaintiff drafted the related Escrow Agreement. A copy of this Contract is attached as **Exhibit "E"**.  Under the terms of the Collateral Agreement and the Escrow Agreement; both stated that in the event of non-performance, the escrow would terminate. The funds would then be released from escrow and held in trust pending further instructions.

When it became apparent Collateral Provider 1 was not going to perform, plaintiff was asked by defendant to provide a *"back up"* collateral provider. Plaintiff worked diligently to secure new financial partners. As mentioned before, plaintiff had already been working with potential financial partners for defendant since before the Addendum came into existence. One of these past potential financial partners had completed their preliminary underwriting on defendant and in January 2010 this party (hereinafter referred to as the **"Lender"),** issued a *Letter of Intent* (the **"LOI"**) for the financing of one of defendant's developments, the Legends Blacksburg. When it became clear Collateral Provider 1 was not going to perform, plaintiff opened negotiations with Lender. Lender agreed to consider being the back-up Collateral Provider, hereinafter **"Collateral Provider 2"**.

When Collateral Provider 1 failed to perform, as per the written terms of the Collateral Agreement and the Escrow Agreement itself, one third of the moneys being held in trust for the failed transaction were returned to Client. Plaintiff immediately brought forth Lender with a TERM SHEET (aka *"BG TERM SHEET"*) as the back-up Collateral Provider 2. Under said Term Sheet, the remaining funds still held in trust in the IOLTA Trust Account, would be paid to Collateral Provider 2 upon their delivery of the back-up collateral. Defendant issued instructions (see **Exhibit "F"** attached hereto) to hold the funds on account to meet the terms set forth by the new collateral provider.

As the business relationship with Lender advanced, a meeting between Defendant & Lender was arranged to meet in Miami, FL. Defendant also made arrangements for plaintiff to travel to Miami. Although the issue of legal fees had been broached many times in the daily communications between defendant & plaintiff; defendant continued to ignore it's open obligations to plaintiff. When plaintiff was instructed to attend the meeting in Miami, plaintiff notified defendant they did not intend to travel to Miami unless plaintiff was paid for his time, was indemnified for past expenses since Nov 1, 2009 through March 2010, and defendant addressed unpaid legal fee obligations ( **Exhibits C-1 through C-3** noted above). In addition, a Billing Statement was presented to defendant ( see **Exhibits "G-1" through "G-3"** attached hereto). After receipt of defendant's Billing Statement and the disclosure that plaintiff would not attend unless the time for traveling on

defendant's business was paid; that if defendant insisted plaintiff attend, plaintiff would credit defendant for said time from assets held in trust, defendant replied **"Great! see you there!"** (see **Exhibit "H"** attached hereto).

Unfortunately, after the meeting in Miami, the terms requested by Collateral Provider 2 were not within the financial capability of defendant and that possibility failed. As a result, no escrow agreement with Collateral Provider 2 was ever drafted. Defendant thereafter instructed plaintiff to return all remaining assets held in trust. Plaintiff replied to defendant's demand by referring to the Billing Statement which was previously received by defendant prior to the trip to Miami.

Based on disclosures in said Billing Statement, all **UNDISPUTED** funds held in trust were immediately wired to defendant. Defendant was then informed that all remaining funds held in the IOLTA Trust account represented **DISPUTED** funds and would remain held *in trust*.

Defendant responded that the moneys which had been placed under the care of Plaintiff was as an escrow attorney. Therefore, in that capacity, it was the fiduciary responsibility of plaintiff to return all funds regardless of any claim for said unpaid fees or any security interest in said proceeds by plaintiff. Defendant further argued escrowed funds are not meant to compensate lawyer or use funds for lawyer's own purpose. Additionally, defendant argued the Fee Agreement had been terminated back in November 2009 by the Addendum and, therefore, plaintiff had no rights there under for either past or current fees due plaintiff. Furthermore, defendant argued they had intended to pay plaintiff a "commission" for all services rendered whenever defendant secured funding as per the terms of the Fee Agreement. All of these arguments fail.

Beginning with the Escrow comment, per the terms of the Escrow Agreement and the Collateral Agreement, upon a failure to perform, the escrow would automatically terminate and the assets released and held in trust until further instructions were received by plaintiff. Failure occurred. Per the terms of said Agreements, the escrows had terminated; and by operation of law the funds were thereafter held *in trust*; and, therefore, any allegation that there was a breach of fiduciary duty under an escrow fails as a matter of law per the stated terms. However, in light of the dispute with defendant, and as required under the Texas Ethics Rules, it is required that all disputed amounts are to be kept in the lawyers trust account while the lawyer makes reasonable efforts to expeditiously resolve the dispute. **Tex. Rule 1.14, comment 2;** <u>Fry v. Comm'n for Lawyer Discipline</u> 979 S.W. 2d 331 (Tex.App.—Houston [14rh Dist.] 1998, pet. Denied). These rules also apply if the dispute has given rise to disciplinary action. <u>In re Freel</u>, 890 Ill.2d 263, 60 Ill Dec. 477, 433 N.E. 2d 274, 277 (1982).

On defendant's argument regarding the Fee Agreement had been terminated by the Addendum, the Addendum only references that the retainer which was being renewed monthly would no longer be paid. Therefore, the Fee Agreement remained a live, operative, contract and the obligations, rights & remedies afforded Plaintiff there under still existed and, therefore, this argument fails.

Defendant also argued they intended to pay plaintiff for outstanding fees through means of a *"commission"*. This argument fails for 2 reasons. First, no such *"commission"* language exists in the four corners of the Fee Agreement. Secondly, just for the sake of argument, if the Fee Agreement was terminated as claimed by defendant, then logically speaking no obligation existed for defendant to pay any alleged *"commission"*. However, given the benefit of the doubt, plaintiff communicated with defendant requesting copy of <u>any</u> documentation (see **Exhibit "I"**) where plaintiff agreed to work for free, or plaintiff agreed to work for a *"commission"* (see **Exhibit "J"**), or if the defendant disputed the time disclosed in the Billing Statement (see **Exhibit "K"** and also see attached Affidavits documenting invested time **Exhibit "L"**: Affidavit – Gordon Snaith, **Exhibit "M"**: Affidavit – Joe Barrett, and **Exhibit "N"**: Affidavit – Keith Anderson). Defendant neither produced any documents, nor disputed the time in the Billing Statement, nor disputed any of the outstanding obligations for services rendered. Defendant's argument rested solely on the claim the moneys had been placed in escrow, and, therefore, plaintiff was obligated to return the funds regardless of any outstanding obligation for unpaid fees due plaintiff.

**APPLICATION of the RULE OF LAW:**

Courts have clearly established through a history of case law that the purpose of the Declaratory Judgment *"is to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations."* Tex. Civ. Prac. Rem. Code Ann. Section 37.002(b) (Vernon 2008): see **Bonham State Bank**, 907S.W. 2d at 467; **Indian Beach Property Owners', Ass'n v. Linden**, 222 S.W. 3d 682, 699 (Tex. App.—[1st Dist.], 2007, no pet). The Courts have said a Declaratory Judgment is appropriate only if a justiciable controversy exists as to rights and status of the parties, and a declaratory judgment can resolve the controversy. **Bonham State Bank**, supra; **Fort Bend County v. Martin-Simon**, 177 S. W. 3d 579, 482-83 (Tex. App...—Houston [1st Dist.] 2005, no pet.)  A trial court has discretion to enter a declaratory judgment so long as it will serve a useful purpose or will terminate the controversy between the parties.  **Bonham State Bank**, supra, citing **Hitchcock Independent School Dist**, 742 S.W. 2d 701, 704(Tex. App. [1st Dist.] 1987l writ denied.) Furthermore, a Declaratory Judgment can be a proper method to determine that a party performed under a contract. See **Stark v Martin-Simon**, supra. 156 S.W. 3d at 117; which held that where a party

sought judicial determination of validity of contract rights and legal relations of the parties under the instrument, and full and final disposition of all claims under the instruments; such questions were a judicial determination of rights under a contract, and were proper for declaratory relief by the Court.

In reviewing the contract issue, the Courts have clearly stated that when a contract exists, where there has been no ambiguous understanding of what the client would be charged, where the work has been performed, where there has been documentation of work performed, that the rates are just & reasonable based on the parameters set forth by the Texas Supreme Court (see below), then attorneys have the right to satisfy outstanding obligations due the attorney from assets held in trust. And more to the point in the case at hand, and contrary to defendant's argument, **even those assets held in escrow**. [emphasis added] See **Stephenson v. Le Boeuf**, 16 S.W.3d 829, 836-38 (Tex.App-Houston [14th Dist.] 2000, rev. denied)*(lawyer who held client's funds in escrow did not breach duty to client by applying funds to satisfy judgment lawyer obtained for unpaid attorney's fees, rather than returning them to client in accordance to terms of escrow agreement)*. However, even more significant in the case at hand, the Fee Agreement clearly states defendant specifically authorized plaintiff to self-indemnify all outstanding obligations from any and all assets held in trust prior to any final disbursement of said assets.

On any possible issue regarding reasonable attorney's fees, the Texas Supreme Court has stated the following factors for courts to consider when determining whether attorney's fees are reasonable:     (1) the time and labor require, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly; (2)  the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involve in the results obtained;  (5) the time limitations imposed by the client or by the circumstances;  (6) the nature and length of the professional relationship with the client;(7) the experience, reputation, and ability of the lawyer or lawyers performing the service; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of payment before the legal services have been rendered. **Arthur Anderson& Co. v. Perry Equip. Corp.**, 945 S.W. 2d 812, 818 (Tex. 1987)(citing Tex. Disciplinary R. Prof/Conduct 1.04, reprinted in Tex. Gov't Code Ann. Tit 2. subtit G app. A (Vernon 2005 and Sup2007) (Tex. State Bar R. art. X Section 9).  However, a court is not required to receive evidence of all of these factors. **Burnside Air Conditioning & Heating v. T.S. Young Corp.**, 113 S.W. 3d 889-98 (Tex. App.—Dallas 2003, no pet.) So, whether attorney's fees are reasonable, necessary, equitable & just, the Courts have held that attorney's fees may be awarded under the Declaratory Judgment Act, supra, even to a non-prevailing party. **Bocquet v. Herring**, 972 S.W. 2d 19, 20 (Tex. 1998).  See **Columbia Rio Grande Reg'l Hospital v. Stover**, 17 S.W. 3d 387, 397 (Tex. App.—Corpus Christi 2000, no

pet.) citing Bouquet; but fees must be for services rendered.  **Stover**, 17 S.W. 3d at 397. Additionally there must be supporting evidence in order to sustain a verdict of an award of attorney's fees. See Bouquet, supra at 20 citing **Beaumont Bank v. Buller**, 806 S.W. 2d 223, 226 (Tex. 1910); where Affidavits were submitted in place of voluminous evidence and a lack of consistent monthly billing. As to the question of monthly billing raised by the Court, the Courts have ruled that absent a clear requirement in the agreement for prompt billing, a lack of prompt billing does not discharge a fee owed under the agreement.  **Williams v. Jackson**, (Tex. Ap.—Houston [1st Dist.], Oct. 9, 2009.  The Court went on to state that when the terms of the contract are clear, unambiguous, and indisputable, and the facts concerning breach or performance are undisputed or conclusively established, the Court decides, as a matter of law, whether the facts show performance or breach.  See id. The Court stated, a resolution by the 'fact finder' is appropriate to resolve underlying factual disputes that pertain to the alleged breach, **but not the breach itself** [emphasis added].  **Meek v. Bishop Peterson & Sharp, P.C.**, 919 S.W. 2d805, 808 (Tex. App.—Houston [14th Dist.] 1996, writ denied.

      Given the statement of facts, and the supporting Exhibits, it should be very clear defendants arguments all fail; that the Fee Agreement does survive and is a live contract. In addition, the fact defendant never disputed that plaintiff had rendered legal services, and the fact there was no objection to the Billing Statement by defendant, and the fact the rate disclosed in the Fee Agreement is clear & unambiguous, and the fact that the escrow obligations under the failed Escrow Agreement had terminated and all funds were being held in trust, and, lastly, the most damaging fact is that per the authority granted by defendant to plaintiff under the Fee Agreement, plaintiff was clearly within his legal right to self-indemnify himself for outstanding obligations due plaintiff by defendant from assets plaintiff held in trust.


**CONCLUSION:**

A Declaratory Judgment should be rendered in favor of Attorney to pay himself for all outstanding obligations due Attorney for work rendered and performed; which are not disputed, and for which the Fee Agreement clearly states Attorney had been granted the legal authority to act from the Client themselves.


**PRAYER:**

8. For these reasons, Plaintiff asks for Judgment in favor of Plaintiff and a Ruling against Defendant for the following:

a.   Payment in full of the $310,000 in attorney's fees shown clearly due Plaintiff, plus any interest due at legal rate on the $310,000.
b.   Reasonable attorney fees.
c.   Costs of Court.
d.   All other equitable & just relief the court deems appropriate.

Respectfully submitted,

**BRADLEY PORRAS STAMP WOLFF, LLC**

*/s/ James Bradley*
James R. Bradley
Texas Bar No. 24005527
P.O. Box 191855
Dallas, TX 75219
(214) 205-4910
finance.attorney@yahoo.com

Plaintiff